**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| STEFAN GLADDEN : | |
| : | |
| v. : | |
| : | CIVIL ACTION NO. 21-4483 |
| AMBLER HEALTHCARE GROUP, : | |
| LLC, *d/b/a* AMBLER EXTENDED : | |
| CARE CENTER, and SABER : | |
| HEALTHCARE GROUP : | |

MCHUGH, J.                                                                                          DECEMBER 15, 2022

### MEMORANDUM

This is an action for race discrimination brought by a dietary aide at an extended care nursing facility. The Plaintiff was employed for approximately 18 months, during which he was cited for a number of deficiencies in performance. He was terminated after failing to secure the kitchen one night before leaving. Relatively late in his tenure, he had three contentious interactions with a co-employee in which he was, unfortunately, the target of a racist epithet. This suit contends that his termination was racially motivated and not based on performance, and that he was forced to endure a hostile work environment. The record provides ample support for the employer's position that his discharge resulted from serious breaches of protocol, not racial animus. As to the work environment, although the insults directed at him are repugnant, the employer intervened in response, and this conduct on the part of one fellow employee falls short of establishing an atmosphere of severe and pervasive racism. I am therefore compelled to grant the employer's pending motion for summary judgment.

**I.      Relevant Background**

Plaintiff Stefan Gladden, an African American male, brings this action against Defendants Ambler Healthcare Group, LLC ("Ambler") and its parent, Saber Healthcare Group ("Saber"),[1] for unlawful discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Pennsylvania Human Relations Act ("PHRA").  He was employed by Defendant Ambler as a Dietary Aide from August 2019 to January 4, 2021, when he was terminated for "willful misconduct" related to an alleged failure to carry out his assigned duties before leaving for the night.  Gladden Dep. at 55:20-56:1; 82:16-18; 116:12-120:5; Ambler Ex. P.

In his Complaint, Plaintiff claimed that he was subject to a hostile work environment, because another Dietary Aide—Ms. Mindi Shorr—called him a "monkey" on three occasions, and because his former supervisor—Mr. Thomas Downing—used foul language toward Plaintiff.  ECF 1, Compl. at ¶¶ 12-15, 38.  Plaintiff also claimed that his termination constituted unlawful racial discrimination and retaliation for reporting Ms. Shorr's racially derogatory statements.  *Id.* at ¶¶ 25, 27-54.

**A. Plaintiff's employment, performance history, and termination**

During his tenure as a Dietary Aide at Ambler, Plaintiff was responsible for "[a]ssisting in food preparation and service while maintaining clean and sanitary conditions in the kitchen and dining areas under the supervision of the Dietary Manager or Cook."  Ambler Ex. C at 1-2.  His duties and responsibilities included "assist[ing] in cleaning and sanitizing work areas, equipment and floors, dishes and utensils," "ensur[ing] proper storage of foods and supplies," "adher[ing] to universal precautions and sanitary infection control policies and procedures," and "ware washing

---

[1] Plaintiff does not contest summary judgment in favor of Saber, because he now concedes that Saber was never his employer.

as assigned," among other items. *Id*. For the time period at issue, he was supervised by the Director of Dietary, Thomas Downing. Downing Dep. at 9:17-10:1, 19:8-13.

Throughout his employment, Plaintiff was disciplined for several incidents related to his attendance and workplace performance, as documented in disciplinary action forms. In July 2020, he received a verbal warning for calling out of work four times during the year to date. Ambler Ex. H. In late November 2020, he received a verbal warning for a job performance issue related to leaving the dish area unclean and full of food debris. Ambler Ex. J. Then, on December 29, he received disciplinary action forms documenting three separate violations. First, he received a written warning for a December 22 violation regarding poor job performance and not following his job description due to—among other things—not cleaning up his work area. Ambler Ex. K. Second, he received a written warning for calling out of work on December 24, 2020, which was his sixth time calling out that year. Ambler Ex. I. Finally, he received another written warning for a December 29 violation arising from sub-standard work performance related to not taking out the trash, leaving items including a broom and mop out, not draining the dish machine, and not cleaning plates, among other items.[2] Ambler Ex. L.

Each disciplinary action form included a notice that "[f]urther violation of facility policy will result in disciplinary action up to and including termination of employment." Ambler Exs. H-L. In addition to these forms, Plaintiff also signed an acknowledgment form indicating that he received Ambler's Employee Handbook, which established a "Progressive Discipline Process." Gladden Dep. at 128:22-129:19; Ambler Ex. Q at 40. Under this process, an employee's first minor offense results in a verbal warning, the second minor offense results in a written warning,

---

[2] All of these disciplinary action forms except for those corresponding with the November and December 29 infractions were signed by both Plaintiff and Mr. Downing. The form for the November infraction was only signed by Mr. Downing, and the form for the December 29 infraction was signed by neither. Ambler Exs. H-L.

and the third minor offense results in termination; an employee's first major offense results in a written warning and the second major offense results in termination; and an employee's first critical offense results in termination. Ambler Ex. Q at 40. According to the Handbook, critical offenses include "[r]efusal to carry out work assignments as directed (insubordination)"; major offenses include "[c]reating and/or contributing to unsafe conditions"; and minor offenses include "[e]xcessive episodes of absence in a rolling twelve month period," "[f]ailure to be at work area to perform work assignments according to normal requirements at the job and/or department policy," and "[l]eaving regular working area or leaving department during working hours without authorization." Ambler Ex. Q at 40-41.

Plaintiff's last full day as an employee of Ambler was January 3, 2021. Ambler Ex. P. In the weeks prior, Mr. Downing had purportedly been "getting on" Plaintiff about working overtime. Gladden Dep. at 61:5-11. On the 3rd, Plaintiff was assigned a double shift, which was scheduled to end at 7 p.m. *Id*. at 60:11-14. Plaintiff did leave at 7 p.m., but some of his tasks were still not done when he left. Ambler Ex. G at 15:1-12. Plaintiff testified that he completed as many responsibilities as he could, but did not finish cleaning the kitchen, because had he not left to catch his train, he would have been stuck at work. Gladden Dep. at 61:18-61:21. Plaintiff asked another Dietary Aide, who was also African American and seventeen years old at the time, to finish the clean-up that was assigned to Plaintiff, because the other Aide lived down the street. Gladden Dep. at 61:18-62:2; 115:3-116:13; 119:20-120:3; 143:3-4. The other Dietary Aide, who had been scheduled to work in the "pot position" until 7 p.m.,[3] did not finish Plaintiff's responsibilities before leaving. Gladden Dep. at 61:18-62:2.

---

[3] *See* Ambler Ex. O; Downing Dep. at 26:9-12.

When Downing arrived the next morning, he found that numerous food items had been left out and therefore needed to be thrown out; that a coffee maker was left on all night; that silverware was left out and uncleaned; and that the work area was generally dirty and disorganized. Ambler Ex. P. He wrote a Disciplinary Action Form for "willful misconduct" and terminated Plaintiff that same day. *Id.*; Gladden Dep. at 116:12-120:5.

### B. Plaintiff's relationships with Ms. Mindi Shorr and Mr. Thomas Downing

With respect to Plaintiff's hostile work environment claim, Plaintiff testified that in 2022, he was called a "monkey" by a white coworker—Ms. Mindi Shorr, another dietary aide—at least three separate times and in front of other coworkers. Gladden Dep. at 47:5-19; 56:2-7. Plaintiff does not recall the specific dates on which these occurred. *Id.* at 47:17-19.

Plaintiff testified that the first incident occurred in the kitchen. *Id.* at 48:8-9. Plaintiff was completing his work when Ms. Shorr said "you are a monkey." *Id.* at 48:8-50:11. When asked how he responded, Plaintiff testified: "I don't recall. I was shocked." *Id.* at 49:5. And when asked whether he said anything back to Ms. Shorr, Plaintiff testified: "I don't remember what I said. I didn't curse. I was just—I don't know. Just—I was just dumbfounded." *Id.* at 49:7-9. Plaintiff testified that he "let it go" rather than report the incident, but that he later learned that word of the incident got back to Mr. Downing. *Id.* at 50:13-18.

Ms. Shorr also called Plaintiff a "monkey" weeks later, on December 20, 2020. *Id.* at 51:1-3; Downing Dep. at 48:1-7; Ambler Ex. M. Plaintiff and Ms. Shorr were both working in the kitchen and were arguing about Ms. Shorr's handling of residents' food trays. Gladden Dep. at 51:4-54:5. Plaintiff called Ms. Shorr a "murderer"—a reference to a previous accident with a patient of Ambler—and Ms. Shorr called Plaintiff a "monkey." *Id.* at 53:18-21, 57:10-19; Ambler Ex. M. According to Plaintiff:

5

> I was shocked.  I didn't say anything back to her.  I said Val (a coworker), did you hear what she said?  She's like yeah, I heard it.  She said yeah, I'm going to tell Tom.  But I don't think she told Tom.  But somebody had to tell Tom, because I didn't personally tell him.

Gladden Dep. at 53:22-54:5.

Mr. Downing testifies that he was in the kitchen during this argument but far enough away that he did not hear what was said.  Downing Dep. at 44:23-46:16.  He then "walked over, told them to cut it out. Focus on their job and get back to work."  *Id.* at 46:1-3.  Mr. Downing further testifies that he spoke with Ms. Shorr later that day:

> Q. And describe for me the conversation that you had with Ms. Shorr where she admitted referring to Mr. Gladden as a monkey.
>
> A. I pulled her aside. I said, Mindi, you two have got to stop this.  I said, what did you call him.  She said a monkey because he called me a murderer.
>
> Q. And what did you say to that?
>
> A. I can't remember the exact advice I gave her.  Perhaps, you know, ignore it. Focus on your job.  Whatever he says, ignore it.  Just do your job.
>
> Q. Did you ever tell her that referring to a black man as a monkey is inappropriate for the workplace?
>
> A. I don't recall using that exact phrase, but I'm sure I said to her, you know, you can't do that.  That's an unacceptable phrase to use to any human being.

*Id.* at 48:8-49:3.

The next day, Mr. Downing and his supervisor, Ms. Karen Pulini, *Id.* at 10:2-13, held a counseling meeting with Plaintiff and Ms. Shorr.  Ambler Ex. M.  Plaintiff testifies that he then learned that Mr. Downing and Ms. Pulini had known that Ms. Shorr had been calling him a "monkey."  Gladden Dep. at 50:13-18; 54:6-10.  The counseling meeting lasted approximately five minutes.  Downing Dep. at 50:20-21.  The Employee Counseling Form for Plaintiff that was signed by Ms. Pulini and Mr. Downing on December 21 reads as follows:

6

> On Sunday 12/20/20 Stephan and Mindi got into a heated argument in the kitchen where Stephan (sic) was calling Mindi a "murderer" and Mindi was calling Stephan a "monkey." Both employees were wrong and were sat down in my office on 12/21/20 to warn both not to ever engage in this kind of name calling again as it will lead to termination. Both employees agreed they were both wrong and promised to work together going forward.

Ambler Ex. M. Plaintiff testified that Ms. Shorr was never written up for the incident. Gladden Dep. at 59:5-24. Mr. Downing maintains that Ms. Shorr did receive an Employee Counseling Form, Downing Dep. at 44:16-19, but Ambler did not submit such a document as part of the record. Plaintiff testified that Ms. Shorr never called him a "monkey" again after this meeting. Gladden Dep. at 57:23-58:1.

Finally, in his deposition, Plaintiff testified that Ms. Shorr called him a "monkey" one other time, when "[s]he just got mad and said it out of anger." *Id.* at 55:7-10. In response, Plaintiff told Ms. Shorr he was going to human resources ("HR"), and "then it was over with." *Id.* at 55:12-13. From Plaintiff's testimony, it is unclear whether this incident took place before or after the incident described above, but Plaintiff testified that Ms. Shorr never called him a "monkey" again after the meeting with Mr. Downing and Ms. Pulini, suggesting that this incident likely took place before the one that resulted in the counseling meeting.

Outside of these incidents, Plaintiff testified that he "used to laugh and joke" with Ms. Shorr. *Id.* at 57:7-9. When asked if he ever called her any names, he testified that he "would call her a parrot. I would make squawking noises and everybody would laugh." *Id*. He also testified that "it really got volatile [between Plaintiff and Ms. Shorr] on the weekends when [Mr. Downing] wasn't there." *Id* at 54:16-55:1. Plaintiff never went to HR about any of the instances with Ms. Shorr or reported them in any fashion. *Id.* at 55:14-19. He claims that he never reported the incidents to HR because he "didn't think they would believe [him] because [she] had been there almost 30 years." *Id.* at 58:15-18. When asked whether he knew that he could bring the issue to

7

Ms. Pulini, he testified that he thought all issues had to go to HR. *Id.* at 58:19-23. When asked whether he knew that he could bring the issue to Mr. Downing, Plaintiff testified: "Yeah. Tom knew about it. But I didn't know that he knew, and he wasn't there when it happened." *Id*. at 58:24-59:4. Plaintiff believes that Ambler did not handle Ms. Shorr's behavior properly. *Id.* at 46:19-21.

In addition to his history with Ms. Shorr, Plaintiff also testified to having a tumultuous relationship with Mr. Downing. Plaintiff testified that when Mr. Downing replaced Plaintiff's previous supervisor, Mr. Downing assigned Plaintiff to work every weekend, despite the union contract guaranteeing a weekend off. *Id.* at 63:4-64:19. Plaintiff notified HR of this in January 2020, after which HR spoke with Mr. Downing. *Id*. Plaintiff testified that Mr. Downing then cut Plaintiff's hours and said to another coworker, "that cocksucker went to HR on me." *Id.* Plaintiff further testified that Mr. Downing "took ownership" of the statement and laughed about it, leaving Plaintiff "shocked." *Id*. Mr. Downing denied ever referring to Plaintiff with such language. Downing Ex. at 38:9-24.

## II. Standard of Review

This Motion is governed by the well-established standard for summary judgment set forth in Fed. R. Civ. P. 56(a), as described by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986).

## III. Discussion

### A. Retaliation

In his Complaint, Plaintiff alleges that his termination was unlawful retaliation under Title VII and the PHRA. In the Third Circuit, courts analyze both Title VII and PHRA retaliation claims under the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*,

8

411 U.S. 792 (1973).  *See Moore v. City of Philadelphia*, 461 F.3d 331, 340-42 (3d Cir. 2006); *Gomez v. Allegheny Health Services, Inc.*, 71 F.3d 1079, 1083-84 (3d Cir. 1995) ("The state Act is construed consistently with interpretations of Title VII."); *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006) ("Claims under the PHRA are interpreted coextensively with Title VII claims.").  To meet the initial burden of establishing a *prima facie* case of discriminatory retaliation, a plaintiff must show "(1) [that he engaged in] protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action."  *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (quoting *Fogleman v. Mercy Hosp. Inc.*, 283 F.3d 561, 567-68 (3d Cir. 2002)).  In the context of a retaliation claim, protected employee activity includes "an employee's filing of formal charges of discrimination against an employer," as well as "informal protests of discriminatory employment practices, including making complaints to management."  *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (quoting *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006)).

Plaintiff in this case admits to having done neither.  After Downing witnessed the argument, on his own initiative, with no prompting from Plaintiff, Downing convened a meeting involving Ambler's Administrator Karen Pulini to address the situation. Plaintiff points to no evidence that he made a complaint of any nature during this meeting.  Because Plaintiff has not shown he engaged in protected activity, he cannot establish a *prima facie* case of retaliation.  I must therefore grant summary judgment for Defendant on this claim.[4]

---

[4] As discussed below, it is also unlikely that Plaintiff would satisfy the third element—causation—because Defendant has introduced evidence showing a non-discriminatory reason for his termination, and Plaintiff did not produce sufficient evidence from which a reasonable jury could conclude that the proffered reason for firing him was pretextual.

### B. Discriminatory Termination

Plaintiff also claims that his termination constituted unlawful racial discrimination. Like retaliation claims, discriminatory termination claims under Title VII and the PHRA are interpreted under *McDonnell Douglas*. *See Gomez*, 71 F.3d at 1084. To succeed on such a claim, a plaintiff must carry the initial burden of establishing a *prima facie* case by showing that (1) he belongs to a protected class, (2) he is qualified for the position, (3) he was subject to an adverse employment action despite being qualified, and (4) the adverse employment action occurred under circumstances that support an inference of discrimination. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). If the plaintiff meets this initial burden, the burden then shifts to the employer to offer a non-discriminatory explanation for the adverse employment action. The employer can do so by "'clearly set[ting] forth, through the introduction of admissible evidence,' reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (emphasis in original) (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254-55 (1981)). The burden then shifts back to the plaintiff to discredit this non-discriminatory explanation as pretextual. *Sarullo*, 352 F.3d at 799-800.

In this case, I cannot conclude that Plaintiff has satisfied his initial burden of establishing a *prima facie* case of discriminatory termination.

Defendant contends that there is no evidence that would support an inference of discrimination, arguing in part that Plaintiff has not demonstrated that a non-African-American employee was treated differently. In response, Plaintiff points to two facts he deems sufficient to support an inference of discrimination. First, Plaintiff argues that the temporal proximity between Plaintiff's termination and the counseling meeting with Ms. Shorr—14 days—suggests that

10

Plaintiff's termination was in part due to racial animus.  For temporal proximity alone to suffice, "the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred."  *Krouse v. Am. Sterilizer Co.,* 126 F.3d 494, 503 (3d Cir. 1997).  I am aware of no precedent that would recognize such an extended window as sufficient to support an inference of discrimination, in the absence of some further evidence.  For that matter, the case Plaintiff cites cuts against him.  *See* Pl's. Response at 7 (citing *Blakney v. City of Phila.*, No. CIV.A. 12-6300, 2013 WL 2411409, at *4 (E.D. Pa. June 4, 2013), *aff'd*, 559 F. App'x 183 (3d Cir. 2014) (holding that a ten-day interval between an event and termination requires "other evidence of wrongdoing.").  The nature of the meeting also does not suggest discrimination.  To the contrary, one purpose of the meeting, called by management, was to address the racial harassment that Plaintiff was experiencing from Ms. Shorr.[5]

The second fact to which Plaintiff points to support an inference of discrimination is that Ms. Shorr called him a "monkey" on three occasions, but Mr. Downing did not intervene until after the third.  As a factual matter, although Plaintiff has testified that Downing was previously aware of the use of the slur, it is unclear how or when Downing became aware of it, and further unclear whether Downing knew of all three instances.  I also find it significant that the meeting to address the situation occurred the day after Downing himself witnessed a confrontation between Plaintiff and Shorr.  In any case, though such delay might possibly be relevant to Plaintiff's hostile work environment claim, it does not directly bear on his termination.

Finally, Plaintiff ignores a significant intervening event after the meeting and immediately before his termination—his failure to clean and secure the kitchen, leaving food out overnight, and leaving the coffee maker on.  This incident seriously attenuates any logical connection between

---

[5] Plaintiff objects to the fact that he was reprimanded for calling Ms. Shorr a "murderer" during the same meeting, Pls. Response at 9, but such an insult is also repugnant, even if not rooted in a racist stereotype.

the meeting in December and Plaintiff's termination in early January. Without evidence supporting an inference of discrimination, Plaintiff's claim fails.

By itself, the lack of a *prima facie* case would warrant summary judgment. *Coleman v. Cmty. Behav. Health*, No. CV 21-47, 2022 WL 62918, at *6 (E.D. Pa. Jan. 6, 2022). For the sake of completeness, however, I will continue the burden-shifting analysis and assess whether Ambler has shown a non-discriminatory basis for the termination. On the record here, it has. Throughout his employment, Plaintiff was repeatedly written up for performance issues. The disciplinary action form that he received each time included the notice that "[f]urther violation of facility policy will result in disciplinary action up to and including termination of employment." Ambler Ex. H-L. The night before his termination, Plaintiff left work without completing his duties, which resulted in the spoilation of food and an elevated fire risk by leaving a coffee maker on all evening. The next morning, he was terminated for willful misconduct. These facts are not disputed and easily suffice to rebut a finding that unlawful discrimination caused Plaintiff's termination.

The burden then shifts back to the plaintiff to produce sufficient evidence to allow a reasonable fact finder to conclude that the proffered reason for the employment action is a pretext for illegal discrimination or retaliation. *Sarullo*, 352 F.3d at 799. The plaintiff can satisfy this burden by "point[ing] to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

In his response, Plaintiff cites four reasons to suggest that Ambler's non-discriminatory reason for firing him was pretextual. First, Plaintiff notes that immediately following the meeting in which he and Shorr were counseled, Plaintiff was written up several more times. But Defendant

has introduced evidence showing credible, non-discriminatory reasons for writing up Plaintiff—reasons that align with documented performance issues that existed from before the counseling meeting. So merely pointing to the fact that he *was* written up does not suffice to show pretext. Second, Plaintiff contends that it was the cook's responsibility to put food away, but this is contradicted by his job description which shows that a Dietary Aide's core duties included "maintaining clean and sanitary conditions in the kitchen and dining areas under the supervision of the Dietary Manager or Cook," including by "ensur[ing] proper storage of foods and supplies." ECF 10-2, Ambler Ex. C at 1-2. Third, Plaintiff states that he was previously told not to stay overtime, which could serve to excuse his failure to complete his duties the evening before he was fired. But such generalities carry no weight here where Plaintiff does not dispute that Downing specifically assigned him the responsibilities he did not fulfill. Finally, Plaintiff questions why the Dietary Aide whom he asked to perform his duties was not disciplined as well despite his also leaving before the kitchen area was secured. But because the other aide was also African-American, any difference in treatment is not evidence of racial discrimination. *See Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 647 (3d Cir. 1998) (explaining that a comparator should show that a similarly situated *nonmember* of a protected class was treated more favorably than a member of the protected class). And Ambler had reason to treat the other aide differently: he was a minor; there is no evidence that he had repeat performance issues; and Ambler had not formally assigned him to finish Plaintiff's job that night, only the Plaintiff did. Given these facts, I separately conclude that even if Plaintiff had established a *prima facie* case, he has not produced sufficient evidence to allow a reasonable fact finder to conclude that the proffered reason for his termination is a pretext for illegal discrimination.

### C. Hostile Work Environment

For a hostile work environment claim, a plaintiff must provide evidence to support five elements: "1) the employee suffered intentional discrimination because of his/her [race], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability [meaning the employer is responsible]." *Castleberry v. STI Grp.,* 863 F.3d 259, 263-66 (3d Cir. 2017) (quoting *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013)). This standard applies to claims brought under both Title VII and the PHRA. *See Atkinson*, 460 F.3d at 454 n.6; Gomez, 71 F.3d at 1084.

Defendant challenges Plaintiff's hostile work environment claim on the ground that Ms. Shorr's comments are not severe or pervasive enough to create a hostile work environment. As the Third Circuit has held, "Title VII is not violated by the 'mere utterance of an . . . epithet which engenders offensive feelings in an employee' or by mere 'discourtesy or rudeness,' unless so severe or pervasive as to constitute an objective change in the conditions of employment." *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 280 (3d Cir. 2001) (quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998)). Consequently, "simple teasing, offhand comments, and [non-serious] isolated incidents" do "not amount to discriminatory changes in the terms and conditions of employment." *Id.* (quoting *Faragher*, 524 U.S. at 788). At the same time, consistent with Supreme Court precedent, the Circuit has also recognized that, while "the resolution of [the] question is context-specific, it is clear that one such instance [of a slur] can suffice to state a claim" for hostile work environment when that slur is particularly malicious and discriminatory. *Castleberry,* 863 F.3d at 264 (citing *Faragher*, 524 U.S. at 788). The controlling

14

question is whether individual incidents are sufficiently "extreme to amount to a change in the terms and conditions of employment." *Id.* (quoting *Faragher*, 524 U.S. at 788).

In this case, the slur that Ms. Shorr used embodied a racist stereotype,[6] and Plaintiff testified that Ms. Shorr used the slur three times. But for a variety of reasons the evidence here falls short.[7] By way of comparison, in *Castleberry,* it was the plaintiffs' supervisor who used the "N-word" in front of a group of Black employees while simultaneously threatening their termination. *Id.* at 265. This came against a backdrop of other allegations that their sign-in sheets would often bear racially derogatory comments, and that they were assigned menial tasks while less experienced white employees were given more complex work. *Id.* at 266. Here, the party using the insult is a co-worker, not a supervisor, and the exchanges were personal and not related to any aspect of the job. Plaintiff points to no other evidence suggesting some racial animus in the workplace. The insults occurred in the context of a relationship where he would "laugh and joke" with Ms. Shorr in some instances, Gladden Dep. at 57:7-9, but fight with her in others. As noted above, he admits to mocking her in the presence of others as a squawking parrot, "and everybody would laugh." *Id*. He also testified that "it really got volatile" between them when a supervisor was not present, *id* at 54:16-55:1, a description that is certainly confirmed by the "monkey-murderer" exchange.

---

[6] *Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 185 (4th Cir. 2001) ("[U]se of the word 'monkey' to describe African Americans was similarly odious [as using the n-word]. To suggest that a human being's physical appearance is essentially a caricature of a jungle beast is degrading and humiliating in the extreme."); *Green v. Franklin Nat. Bank of Minneapolis,* 459 F.3d 903, 911 (8th Cir. 2006) ("The use of the term 'monkey' and other similar words have been part of actionable racial harassment claims across the country.").

[7] Plaintiff also cites allegations that his supervisor used foul language toward him, including calling him a "cocksucker." But Plaintiff's testimony specifically links this to his supervisor's annoyance that he went to HR to request a weekend off. However crude and inappropriate, such conduct does not bear upon unlawful racial animus.

Importantly, although Plaintiff was "shocked" and "dumbfounded" at Ms. Shorr's use of the slur, *id.* at 49:5-9, he also testified that he "let it go." *Id.* at 50:13-18. He threatened to report it to HR but did not. There is nothing in the record to show that Shorr's comments, ignorant though they were, "unreasonably interfere[d] with an employee's work performance," discouraged him from "remaining on the job," or interfered with advancement. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-23 (1993).

Plaintiff maintains that he did not report the behavior to HR or the facility administrator, because he "didn't think they would believe [him]." Gladden Dep. at 58:17-18. It was not because he had observed other complaints get ignored by management. Plaintiff testified that he "felt as though [he] was called derogatory, racist names and it wasn't handled properly," *id.* at 46:19-21, but does not specify in what respect Ambler's response was lacking. It was Plaintiff's understanding that Mr. Downing and Ms. Pulini were aware of Shorr's use of the epithet before the kitchen confrontation that Downing himself witnessed, but the record is entirely unclear as to how or when Downing or Pulini would have learned of such episodes without Plaintiff reporting. It is undisputed that Mr. Downing convened a meeting with the Administrator the day after Downing saw the employees in a heated exchange, and that counseling session effectively stopped the behavior at issue. As a rule, an "employer cannot be liable under Title VII if its remedial action stopped the harassment," *Huston v. Procter & Gamble Paper Prod. Corp.*, 568 F.3d 100, 110 (3d Cir. 2009), and the most Plaintiff can argue is that, if Downing and Pulini were aware of Shorr's use of the term "monkey," they may have been slow to react where Plaintiff himself did not seek any intervention on the part of his employer.

Given this record, summary judgment is appropriate on Plaintiff's hostile work environment claim.

**IV.     Conclusion**

For the reasons set forth above, Defendants' Motion for Summary Judgment will be granted.

<u>/s/ Gerald Austin McHugh</u>
United States District Judge